ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ROCHESTER, NEW HAMPSHIRE, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>JUUL LABS, INC. and ALTRIA GROUP, INC.,<br><br>                              Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Rochester, New Hampshire ("The City of Rochester" or "Plaintiff") brings this class action individually and on behalf of all others similarly situated against Defendants JUUL Labs, Inc. ("JUUL") and Altria Group, Inc. ("Altria") (collectively, "Defendants") and asserts claims for violation of the New Hampshire Consumer Protection Act ("NHCPA"), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq.*, public nuisance, negligence, and unjust enrichment.

## I.    INTRODUCTION

1.    This action arises out of Defendants' creation of a nationwide epidemic – based on numerous fraudulent activities – of underage nicotine addiction caused by "vaping" with JUUL's popular electronic cigarette or "e-cigarette," which has directly resulted in Plaintiff and other similarly situated municipalities, counties, and schools in New Hampshire and across the country to expend their limited resources to attempt to curb the severe public nuisance Defendants created, and which is ongoing.

2.    Defendants created the public nuisance by, among other things: (a) designing the JUUL e-cigarette and its packaging to aesthetically appeal to kids and to be easily concealable; (b) selling nicotine cartridges or "JUULpods" in multiple fruity flavors that appeal to kids (*e.g.* Fruit Medley, Crème Brûlée, Mango, Cool Cucumber, and Cool Mint); (c) designing its patented nicotine formula to be significantly more addictive than cigarettes; (d) directly marketing the JUUL e-cigarette to children through youthful, colorful, and vibrant images in print advertising, by saturating social media channels frequented by children, by paying young "influencers" to endorse JUUL's products, by hosting "pop-up" parties in trendy cities to provide free samples of its fruity JUULpods, and by making purported "educational" presentations to kids on school campuses to falsely represent the purported "safety" of JUUL's e-cigarette; and (e) making false and misleading statements about the safety of the JUUL e-cigarette and downplaying or omitting disclosure of the risks of addiction associated with its use.

COMPLAINT                                                                                          - 1 -

3.    The current epidemic of underage nicotine addiction that JUUL created is no accident.    JUUL founders and executives closely studied the Big Tobacco playbook and successfully implemented the techniques that Big Tobacco used to hook a prior generation on nicotine in order to mislead a new generation into believing that e-cigarettes, unlike traditional cigarettes, are safe and not addictive.    With this unconscionable strategy, JUUL experienced a meteoric rise in the popularity of its e-cigarette and secured a 76% share of the e-cigarette market in only a few short years.

4.    JUUL, with the help of significant financial investment from Altria – the company behind the Marlboro brand that now owns a 35% stake in JUUL – was so effective in marketing its e-cigarettes to children that its marketing efforts are now self-perpetuating.    Obviously, kids who are addicted to JUUL's e-cigarette will continue to use the product.    But JUUL's marketing has made its e-cigarette a teen pop culture icon and status symbol.    So kids recommend JUUL to their peers and other kids are inclined to begin using JUUL to fit in with their peer group.    Further, even though JUUL allegedly closed its social media accounts, JUUL's social media reach continues through peer-to-peer viral marketing by kids who continue to promote JUUL-related hashtags and images, which JUUL initiated.

5.    Defendants' unlawful practices have generated billions of dollars in revenue in just a few short years by ensnaring a new generation of the nation's youth in addiction.    This has created a national epidemic and a public nuisance for municipalities, counties, and schools across the country that are now faced with the task of undoing the damage done by Defendants by educating students and young people on the dangers of e-cigarette use and policing the significantly increased use of e-cigarettes.

6.    Plaintiff, like municipalities, counties, and schools across the nation, has been forced to expend its limited resources to attempt to curb the public nuisance Defendants created.    By this action, Plaintiff, individually and on behalf of the Class (defined below), seeks to put an end to Defendants' unconscionable and fraudulent practices, to recover damages caused by those practices, and to force Defendants to abate the public nuisance they created by, among other things, establishing an abatement fund to be used by Plaintiff and the Class for that purpose.

COMPLAINT                                                                                                         - 2 -

## II.    PARTIES

7.    Plaintiff The City of Rochester, New Hampshire is a city in Strafford County, New Hampshire.  The city includes the villages of East Rochester, Gonic, and North Rochester.  The City of Rochester includes the Rochester School Department, which includes one high school, one middle school, eight elementary schools, and an alternative high school.

8.    Defendant JUUL Labs, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in San Francisco, California.  JUUL originally operated under the name PAX Labs, Inc. until 2017.  JUUL manufactures, markets, and sells e-cigarettes and pre-filled nicotine cartridges called JUULpods.

9.    Defendant Altria Group, Inc. is, and at all relevant times was, a Virginia corporation with its principal place of business in Richmond, Virginia.  Altria is the parent company of Phillip Morris USA (producer of Marlboro cigarettes).  On December 20, 2018, Altria purchased a 35% stake in JUUL.

## III.    JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1332, as well as 18 U.S.C. §1964(c).  The Court also has supplemental jurisdiction over Plaintiff's state and common-law claims under 28 U.S.C. §1367.

11.    This Court has personal jurisdiction over each Defendant because JUUL is headquartered and does business in the State of California, each Defendant purposefully availed itself of the privilege of exploiting forum-based business opportunities, and the exercise of personal jurisdiction is consistent with Section 410.10 of the California Code of Civil Procedure.  This Court also has personal jurisdiction over Defendants under 18 U.S.C. §1964(c).

12.    Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted herein arose in this District and Defendants are subject to personal jurisdiction in this District.

COMPLAINT                                                                                          - 3 -

IV.    **FACTUAL ALLEGATIONS**

A.    **JUUL Sought to Disrupt the Tobacco Industry with a Highly Addictive E-Cigarette**

13.    In 2015, with $50 million in venture capital funding, JUUL launched its new e-cigarette device.  JUUL's e-cigarette looks a lot like a small USB flash drive.  In fact, the charger for the device uses a USB port.  The e-cigarette consists of a rechargeable battery, a heating element, and a JUULpod containing JUUL's patented nicotine solution.  The size, shape, and USB-like appearance of JUUL's e-cigarette makes it easy to conceal, especially from untrained adults who might assume it is an innocuous USB flash drive.



14.    The nicotine dose that a JUUL e-cigarette delivers is extremely potent and addictive. Significantly more so than the nicotine delivered by traditional cigarettes.

15.    The National Institutes of Health has noted that the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[1]  As revealed by a

---

[1] *See* NCBI, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable    Disease:    A    Report    of    the    Surgeon    General*    (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

COMPLAINT                                                                                                    - 4 -

1973 memo by a scientist for R.J. Reynolds Tobacco Company ("RJR") entitled, "Cigarette Concept to Assure RJR a Larger Segment of the Youth Market[,]" tobacco companies have long exploited this fact in order to increase the addictiveness of cigarettes by using nicotine salt additives like nicotine benzoate to increase nicotine delivery, such as the those developed and patented by RJR in order to give cigarettes an "additional nicotine 'kick.'"[2]

16.     JUUL sought to add the same "nicotine kick" to its e-cigarette that RJR and other tobacco companies relied on for years to create addicts and repeat customers who supported the billion dollar tobacco industry.  Taking the lead from RJR, JUUL developed and patented a nicotine salt formula (nicotine benzoate) that combined benzoic acid with nicotine (U.S. patent No. 9,215,895, the "'895 patent").  Blood plasma studies in the '895 patent show that nicotine benzoate increases nicotine delivery over cigarettes by up to four times.  Thus, although JUUL advertises some of its JUULpods as containing 5% nicotine, that representation is materially misleading because, when considering the accelerated rate of nicotine absorption that occurs in the body with JUUL's patented nicotine salt formula, a user ultimately receives a higher and stronger dose of nicotine than advertised.

17.     JUUL's advertisement of the amount of nicotine in a JUULpod is also materially misleading because independent studies have confirmed that JUULpods actually contain more nicotine than advertised.  One study tested four flavors of JUULpods advertised as 4% strength and found that they contained a 4.5% benzoic acid solution, and that JUULpods advertised as 5% nicotine actually contained a concentration of 6.2% nicotine salt.[3]  These variances from the advertised amounts of nicotine are significant.  Even "a small percentage can double, triple, or quadruple the amount of free nicotine available for inhalation in cigarette smoke." *United States v. Philip Morris USA., Inc*., 449 F. Supp. 2d 1, 353 (D.D.C. 2006).

18.     JUULpods containing 1.2% more nicotine than advertised on a 5% label – a 20% increase – together with the faster nicotine absorption that JUUL's patented formula provides,

---

[2]   Memorandum from Frank G. Colby (Dec. 4, 1973), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mzfx0091.

[3] James F. Pankow, et al., *Benzene formation in electronic cigarettes*, PLOS ONE (Mar. 8, 2017), https://doi.org/10.1371/journal.pone.0173055.

creates an e-cigarette that is far more addictive than any e-cigarette on the market, and even more addictive than traditional cigarettes. Defendants failed to disclose these facts and actually downplayed the addictive properties of JUUL's e-cigarette in order to increase adoption of the product by minors.

19.     Prior to launching its e-cigarette in June 2015, JUUL provided media outlets with charts illustrating the results of a self-commissioned study purporting to compare changes in blood-nicotine levels resulting from the use of JUUL e-cigarettes as compared to traditional cigarettes and other e-cigarettes.





20.     Both charts are false and misleading as they directly contradict the results of the study reported in JUUL's own '895 Patent, which concluded that JUULpods deliver nicotine into the blood stream up to four times faster than traditional cigarettes.  Indeed, contrary to the results of the study reported in JUUL's '895 Patent, these charts falsely represented that JUULpods deliver 25% less nicotine than traditional cigarettes and, thus, created the false impression that JUUL e-cigarettes are safer and less addictive than other e-cigarettes and traditional cigarettes.

21.     As noted above, JUUL also misrepresented the specific amount of nicotine contained in a JUULpod, and it also falsely represented that the amount of nicotine in a single JUULpod is approximately equivalent to one pack of cigarettes or 200 puffs.  These statements were false and materially misleading because independent studies show that JUULpods contain at least 20% more nicotine than advertised, and, moreover, because JUUL's patented nicotine salt formula delivers nicotine into the blood stream up to four times faster than a traditional cigarette, JUUL's comparison of a JUULpod to a pack of cigarettes is like comparing apples and oranges.

22.     The fact that JUUL e-cigarettes – which are plainly marketed to children – deliver a dose of nicotine that is far stronger and far more potent than traditional cigarettes is extremely troubling.  Nicotine is a highly addictive and harmful substance, especially for adolescents whose developing brains are particularly susceptible to addiction.  Numerous studies have shown that

COMPLAINT                                                                                          - 7 -

1   nicotine use by adolescents disturbs cognitive function and development.  In addition, vaping itself

2   introduces harmful substances into the lungs, which can lead to pulmonary disease and other health

3   issues.  Indeed, to date, there have been over 1,888 reported cases of vaping-related lung illness and

4   37 reported deaths across the country.[4]

5   **B.**    **The Big Tobacco Playbook: JUUL's Marketing Directly Targets Kids**

6   23.    As Big Tobacco has long known, minors are the prime target market for addictive

7   tobacco products.  Nearly 80% of smokers begin before the age of 18.  Because the developing

8   adolescent brain is more sensitive to addiction, adolescents who begin smoking are more likely to

9   become life-long addicts and customers.  As RJR's Vice-President of Marketing explained in 1974,

10   the "young adult market . . . represent[s] tomorrow's cigarette business.  As this 14-24 age group

11   matures, they will account for a key share of the total cigarette volume – for at least the next 25

12   years."[5]  In order to dominate the e-cigarette market, JUUL studied the Big Tobacco playbook and

13   shamelessly adopted the same strategy of targeting this key demographic in order to increase its

14   own profits.

15   **1.**    **JUUL's Sleek "Tech" Design and Kid-Friendly Fruit Flavors**

16   24.    From the outset, JUUL deliberately designed its e-cigarette to be attractive to young

17   people.  Rather than replicate the cylindrical shape of a cigarette, which has negative associations

18   in peoples' minds, JUUL designed its e-cigarette to be sleek and rectangular and to look like a tech

19   device that would appear attractive lying next to an iPhone.  Indeed, JUUL designed the packaging

20   of its e-cigarette to be clean and minimalist, reminiscent of the packaging for an iPhone.  As noted,

21   JUUL's e-cigarette is also small and easily concealable and resembles a USB flash drive for a

22   computer, which is commonly used in schools, and thus, adds to the concealability of the device by

23   students.

24

25

---

26   [4]   Centers for Disease Control and Prevention, *Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping* (Oct. 31, 2019), https://www.cdc.gov/tobacco/basic_information/e-

27   cigarettes/severe-lung-disease.html.

28   [5]   UCSF   Library,   *Truth   Tobacco   Industry   Documents*   (Sept.   30,   1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

25.    Long ago, Big Tobacco was banned from selling flavored cigarettes precisely because they appeal to kids.  That did not stop JUUL from developing its own line of JUULpods to include multiple flavors that are attractive to kids – flavors like Fruit Medley, Crème Brûlée, Mango, Cool Cucumber, and Cool Mint – which demonstrates the egregiousness of JUUL's conduct.




26.    JUUL even went a step further to downplay the hazards of e-cigarette use by associating its JUULpods with harmless foods.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    27.    Unsurprisingly, JUUL's reliance on kid-friendly flavors achieved the same success

17 in attracting underage customers as Big Tobacco.  Indeed, 81.5% of underage e-cigarette users said

18 they used e-cigarettes "because they come in flavors I like."[6]

19    28.    Altria is well aware of the dangers posed by kid-friendly flavors.  Notably, after

20 failing to achieve JUUL-like success with its own e-cigarette product, Altria, in a letter to the U.S.

21 Food and Drug Administration ("FDA") on October 25, 2018, claimed to have "serious concerns"

22 about youth access to e-vapor products, and to "address what FDA has called an epidemic of

23 underage use of e-vapor products[,]" Altria announced that it was removing from the market "all

24 flavored e-vapor products except for tobacco, menthol and mint."[7]    Altria's concerns seem

25

26 [6]    NCBI, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General* (2016), https://www.ncbi.nlm.nih.gov/books/NBK538687/.

27 [7]    Philip Morris USA, *Altria Takes Action to Address Youth E-Vapor Use* (Oct. 25, 2018), http://www.altria.com/harm-reduction/Helping-Reduce-Underage-Tobacco-Use/addressing-youth-e-vapor-use/Pages/default.aspx.

28

COMPLAINT                                                                                                      - 10 -

1   disingenuous, however, as less than two months later, on December 20, 2019, Altria announced a
2   $12.8 billion dollar investment in JUUL, which gave Altria a 35% stake in JUUL, and allowed it to
3   profit off the success of flavored e-cigarettes through the back door while, through the front door,
4   paying lip service to concerns about reducing the youth vaping epidemic.

5       29.     The youth attraction to JUULpod flavors ultimately prompted the FDA to write to
6   JUUL in September 12, 2018 to suggest that it remove flavored products from the market as a
7   means of curtailing use by minors.  As the underage vaping epidemic worsened, Massachusetts,
8   Michigan, New York, Rhode Island, Montana, Oregon, and Washington all exercised executive
9   powers to ban the sale of flavored e-cigarettes in their respective states, while other states are
10  considering enacting similar legislation.  And San Francisco – home to JUUL's corporate
11  headquarters – voted to ban outright the sale and distribution of e-cigarettes in the city.

12                  **2.      JUUL's Vaporized Campaign**

13      30.     Historically, tobacco companies targeted the key adolescent market by:
14  "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes
15  in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion
16  strategies to knowingly reach teenagers."   *Philip Morris*, 449 F. Supp. 2d at 572. Their
17  advertisements relied on imagery highlighting "independence, adventurousness, sophistication,
18  glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness,
19  and being 'cool.'"  *Id*. at 571.

20      31.     These words describing historical Big Tobacco 20th Century advertising techniques
21  describe JUUL's 21st Century advertising campaign exactly.  And that is no accident.  JUUL's
22  founders publicly acknowledged that they studied the thousands of internal Big Tobacco documents
23  that were made available under the Master Settlement Agreement between Big Tobacco and the
24  states, stating that those documents "became a very intriguing space for us to investigate because
25  we had so much information that you wouldn't normally be able to get in most industries. And we

26
27
28

1    were able to catch-up, right, to a huge, huge industry in no time. And then we started building

2    prototypes."[8]

3          32.     Indeed, JUUL wasted no time at all to "catch up" to Big Tobacco.  JUUL launched

4    its e-cigarette in June 2015 with its "Vaporized" advertising campaign that clearly targeted young

5    people with images and themes that appeal to teenagers,[9] including a spread in *VICE* magazine,

6    which claims to be the "#1 youth media company in the world."[10]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



24    [8]   Gabriel Montoya, *PAX Labs: Origins with James Monsees*, Social Underground,
https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited
25    Nov. 4, 2019).

26    [9]   Declan Harty, *JUUL Hopes to Reinvent E-cigarette Ads With "Vaporized" Campaign*, AdAge
(June   23,   2015),   http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-
27    adscampaign/299142/.

28    [10]   Vice   Digital   Media   Kit   (Jan.   2016),   https://upload-
assets.vice.com/files/2016/01/15/1452894236compressed.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   33.    It is important to note that the handful of images shown above are merely examples.

18  Stanford University researchers investigating JUUL's marketing campaign uncovered thousands of

19  other similar youth-oriented images that the company used to market its products.[11]

20   34.    Regarding JUUL's advertising, the Campaign for Tobacco-Free Kids noted

21  "obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements,

22  sponsorships and various flavors" and expressed "concern about the Juul campaign because of the

23  youth of the men and women depicted in the campaign, especially when adjoined with the design."[12]

24

25

---

26  [11]  *See* http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php
    (last visited Nov. 4, 2019); *see also* Erin Brodwin, *See how Juul turned teens into influencers and*
27  *threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company*, Business Insider (Nov.
    26, 2018), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.

28  [12]  *See supra* n.8.

35. In addition to the vibrant and youthful imagery used in the Vaporized campaign, JUUL followed the trend of "pop-up" bars and restaurants that attract a young and hip clientele seeking an exclusive experience by setting up a number of pop-up "JUUL bars" and "launch parties" in hip urban cities like Los Angeles and New York.

36. JUUL's launch parties were patently youth-oriented, and guests were invited to try JUUL's products for free and share selfies on social media using the hashtag #LightsCameraVapor.



An ad for Juul's launch party posted on Instagram and shared by Juul (JuulVapor). SRITA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27
28



37.    One of the aims of JUUL's launch parties was to give away free samples of its products.  More than 1,500 samples were given out at each event, according to materials viewed by BUSINESS INSIDER from the Los Angeles-based advertising firm that helped JUUL plan the events. JUUL did not stop this practice when it learned that U.S. regulators forbade free sampling of tobacco products – it simply skirted the prohibition by charging $1 for each sample.

### 3.    JUUL Saturated Social Media with Youth-Oriented Content

38.    JUUL also directly targeted minors by saturating social media channels frequented by kids, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone with seemingly unthreatening and innocuous tweets that downplayed the serious health and addiction risks of its product.



39.    JUUL paid young "influencers" with large social media followings to promote its product on their social media channels, and JUUL pioneered a number of JUUL-related hashtags that would be shared by kids and create viral peer-to-peer communication among teens who essentially became brand ambassadors for JUUL and ultimately integrated JUUL's own marketing into user-generated content that would, and has, perpetuated even after JUUL allegedly closed its social media accounts.

40.    JUUL's social media campaign was hugely successful.  One study found that despite spending "no recorded money" on advertising in the first half of 2017 (other than $20,000 on business-to-business advertising), JUUL grew by nearly 700%.[13]  By contrast, one of JUUL's less-successful competitors spent $16 million on television advertisements alone and still failed to achieve the same growth that JUUL experienced.  JUUL's explosive growth in 2017 correlates precisely with its increased reliance on Twitter during the same period:

---

[13]    Jidong Huang, et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

### 4.    JUUL Marketed Directly to Kids in Marketing Events Disguised as "Educational" Programs

41.    Like Big Tobacco before it, JUUL attempted to go right to the source in its efforts to market to children: schools.  Disturbingly, JUUL reached out to a number of school officials to offer free "educational" presentations to students purportedly designed to discourage teen vaping. JUUL's intention with the program, however, was anything but altruistic.  JUUL simply wanted to market its product directly to children, albeit while misrepresenting the health risks and addictive properties of its e-cigarette.   Rather than discourage vaping use, in one example, JUUL representatives on school campuses reportedly told students that JUUL was "totally safe," that it "was much safer than cigarettes," that the "FDA would approve [JUUL] any day[,]" that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon[,]" and that a student "should mention JUUL to his . . . friend . . . because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use."[14]

42.    The evidence suggests that JUUL made similar presentations to students at other schools across the country.

[14] FDA Warning Letter (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

COMPLAINT                                                                                                          - 19 -

5.    **JUUL's Unlawful Marketing Succeeded in Securing a Position in Teen Pop Culture that Continues to Exponentially Grow JUUL's Popularity Among Adolescents**

43.    Like Big Tobacco before, the long-lasting damage from JUUL's direct-to-kid marketing campaign cannot be overstated. Not only does addiction ensure that adolescents continue to use and buy JUUL's products, but JUUL succeeded in making its e-cigarette a teen pop culture icon. This ensures that kids will continue to use the product for status and to recommend the product to their peers, who will likewise be inclined to begin using the product to join the crowd.

44.    Taking notice of this obvious fact, a number of manufacturers have begun to sell JUUL accessories that are clearly designed for children, and that serve to further solidify JUUL's position in teen pop culture. For example, some companies sell JUUL "skins" to decorate a JUUL e-cigarette with kid-focused imagery of Batman, the Simpsons, popular video games, and even ones that glow-in-the-dark.










### D.    JUUL's Unlawful Conduct Has Created a Public Nuisance of "Epidemic Proportions"

45.    As a result of the strong anti-smoking efforts that have successfully educated young people about the dangers of smoking, youth smoking rates have dramatically decreased over the past decade – from 28% in 2001 to 7.6% in 2017.

46.    By picking up where Big Tobacco left off and applying the same techniques that allowed Big Tobacco to ensnare America's youth in nicotine addition, JUUL has managed to reverse the success of those prior anti-smoking efforts.  Indeed, a 2016 report from the U.S. Surgeon General cited a 900% increase in e-cigarette use by high school students from 2011 to 2015, and the 2016 National Youth Tobacco Survey noted that 1.7 million high school students said they had used e-cigarettes in the previous 30 days.[15]  For middle school students, the number was 500,000. Studies show that one in five eighth-graders that currently use tobacco products got there by starting with an e-cigarette.

47.    In September 2018, the FDA declared that teenage use of e-cigarettes had reached "an epidemic proportion," and put manufacturers of the most popular devices, including JUUL, on notice that they had just 60 days to prove they can keep their devices away from minors.  The agency raised the possibility of civil or criminal charges if companies are allowing bulk sales

---

[15]  Roni Selig, et al., *Vaping now an epidemic among US high schoolers*, CNNhealth (Apr. 6, 2018), https://www.cnn.com/2018/04/06/health/high-schools-vaping-epidemic/index.html.

1  through their websites, as JUUL had done.  On September 28, 2018, the FDA raided JUUL's

2  headquarters, "carting away more than a thousand documents it said were related to the company's

3  sales and marketing practices."[16]  Following the raid, in October 2018, the FDA reiterated that the

4  "new and highly disturbing data [it has] on youth use demonstrates plainly that e-cigarettes are

5  creating an epidemic of regular nicotine use among teens[.]"[17]

6        48.    On November 13, 2018, JUUL bowed to pressure from the FDA and finally agreed

7  to stop selling Mango-, Fruit Medley-, Crème Brûlée-, and Cucumber-flavored JUULpods at more

8  than 90,000 retail stores, and agreed to require additional age verification measures for online sales

9  of flavored JUULpods.  The company also announced that it would delete its Facebook and

10  Instagram accounts and halt promotional posts on Twitter.  These purported actions, to the extent

11  they were even taken, have done nothing to curb the epidemic and public nuisance that Defendants

12  created.

13        **E.    The Public Nuisance Created by Defendants Has Harmed, and Will
               Continue to Harm, Plaintiff**

15        49.    Plaintiff, its citizens, and its students are directly impacted by the epidemic

16  Defendants created.  This has forced The City of Rochester, like other municipalities, counties, and

17  schools across the nation, to incur damages to attempt to curb the public nuisance Defendants

18  created.

19        50.    The City of Rochester has spent significant money over the years on youth tobacco

20  education, prevention, and early intervention programs at its schools, which was spent in vain due

21  to Defendants' successful efforts to reverse the progress of those programs.

22        51.    The City of Rochester's School Department has seen a dramatic increase in youth

23  vaping in its high school and middle school.  The City of Rochester's School Department was

24  forced to divert financial and human resources to address the JUUL vaping epidemic, including to

25  provide prevention education and early intervention specific to JUUL, as well as one-on-one and

---

[16]  Jan Hoffman, *F.D.A. Seizes Documents From Juul Headquarters*, THE NEW YORK TIMES (Oct. 2, 2018), https://www.nytimes.com/2018/10/02/health/juul-ecigarettes-fda-raid.html.

[17]  *Id.*

COMPLAINT                                                                      - 22 -

group counseling sessions for high-risk students and re-entry students returning from suspension for breaking school vaping policy, and also to fund and operate the School Department's restorative justice program, which processes cases of vaping violations in The City of Rochester's high school and middle school.

52.    The City of Rochester has also expended significant resources to fund and operate its high school's "buy back" program in relation to vaping-related school suspensions.

53.    In direct response to the youth vaping epidemic Defendants created, The City of Rochester was forced to hire additional staff, including to fill a newly created "Community Center Attendant" position at the Rochester Community Center, which shares a location with The City of Rochester's high school and alternative high school and hosts all of the youth and school sporting events in The City of Rochester.

54.    The City of Rochester has also expended significant resources to police and punish vaping violations through its police department, including through the City's alternative sentencing programs.

55.    The City of Rochester's current available resources to address Defendants' public nuisance are extremely limited.  The City of Rochester requires additional funds to implement more comprehensive prevention education and early intervention efforts, among other things, to truly address and end the vaping epidemic that Defendants created.

## V.    CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this proposed class action under Rules 23(a), 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following nationwide class ("Nationwide Class"):

> ***All cities, counties, or municipalities in the United States that have expended resources to address, or whose property has been affected by, underage use of JUUL products.***

57.    In addition, Plaintiff seeks to represent the following New Hampshire sub-class ("New Hampshire Sub-Class"):

> ***All cities, counties, or municipalities in New Hampshire that have expended resources to address, or whose property has been affected by, underage use of JUUL products.***

COMPLAINT                                                                                          - 23 -

58.     The Nationwide Class and the New Hampshire Sub-Class are collectively referred to herein as the "Classes" or the "Class."

59.     Excluded from the Classes are Defendants and any parents, subsidiaries, corporate affiliates, officers, directors, employees, assigns, successors, the Court, Court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above.

60.     Plaintiff reserves the right to revise the definition of the proposed Classes based upon subsequently discovered information and reserves the right to establish sub-classes based on the evidence adduced in discovery, or as necessary and appropriate.

61.     **Numerosity.**  The members of the Class are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff alleges that the Class contains thousands of members who may be notified of the pendency of this action by first class mail, electronic mail, or published notice.

62.     **Commonality and Predominance.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendants made material misrepresentations and omissions regarding the safety and addictive nature of JUUL e-cigarettes and JUULpods;

(b)     whether Defendants unlawfully marketed their products to minors;

(c)     whether Defendants unlawfully contributed to a public nuisance;

(d)     whether Defendants breached a duty of care owed to Plaintiff and the Class;

(e)     whether Defendants engaged in a pattern of racketeering activity;

(f)     whether Defendants are liable for monetary damages to Plaintiff and the Class, and the measure of those damages;

(g)     whether Defendants are liable for restitutionary damages to Plaintiff and the Class, and the measure of such restitutionary damages;

(h)     whether Defendants acted with malice, fraud, or oppression such that they are liable for punitive damages;

(i)     whether Defendants were unjustly enriched;

COMPLAINT                                                                                          - 24 -

1          (j)      whether Plaintiff and the Class are entitled to abatement; and

2          (k)      whether Plaintiff and the other Class members are entitled to injunctive and

3 other equitable relief and, if so, what is the nature of such relief.

4          63.    **Typicality**.  Plaintiff's claims are typical of the claims of each Class member in that

5 Defendants' practices harmed Plaintiff in the very same manner that they harmed each of the other

6 Class members.

7          64.    **Adequacy**.  Plaintiff will fairly and adequately protect the interests of the Class.

8 Plaintiff has retained counsel highly experienced in complex consumer class action litigation, and

9 Plaintiff intends to vigorously prosecute this action.  Further, Plaintiff has no interests that are

10 antagonistic to those of the members of the Class.

11         65.    **Superiority**.  A class action is superior to all other available means for the fair and

12 efficient adjudication of this controversy.  The damages or other financial detriment suffered by

13 individual Class members is relatively small compared to the burden and expense that would be

14 involved in individual litigation of their claims.  It would, thus, be virtually impossible for the Class,

15 on an individual basis, to obtain effective redress for the wrongs committed against them.

16 Furthermore, even if Class members could afford such individualized litigation, the court system

17 could not. Individualized litigation would create the danger of inconsistent or contradictory

18 judgments arising from the same set of facts. Individualized litigation would also increase the delay

19 and expense to all parties and the court system from the issues raised by this action. By contrast,

20 the class action device provides the benefits of adjudication of these issues in a single proceeding,

21 economies of scale, and comprehensive supervision by a single United States District Court, and

22 presents no unusual management difficulties under the circumstances here.

23 VI.    **CAUSES OF ACTION**

24                                **COUNT I**

25                **Violation of the New Hampshire Consumer Protection Act**
                                **Against all Defendants**
26

27         66.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth

28 herein.

COMPLAINT                                                                    - 25

67.     The NHCPA prohibits any unfair or deceptive act or practice in the conduct of any trade or commerce.  N.H. Rev. Stat. §358-A:2, *et seq.*  It expressly designates the following as examples of unfair or deceptive trade practices:

- Representations that consumer goods have characteristics, uses, or benefits that they do not have (N.H. Rev. Stat. § 358-A:2(V)); and

- "Advertising goods or services with intent not to sell them as advertised" (N.H. Rev. Stat. §358-A:2(IX)).

68.     During the relevant period and as alleged herein, Defendants each engaged in unfair and deceptive acts or practices in trade or commerce in violation of the NHCPA by actively promoting and marketing e-cigarettes to minors, circulating false and misleading information concerning the safety of e-cigarettes, and downplaying or omitting the risk of addiction arising from their use.

69.     Plaintiff and its residents and students have been, and continue to be, harmed by Defendants' violations of the NHCPA.

70.     Defendants' unfair or deceptive acts or practices in violation of the NHCPA offend New Hampshire public policy, are immoral, unethical, oppressive, or unscrupulous, as well as malicious, wanton, manifesting ill will, and causing substantial injury to Plaintiff and its citizens and students.

## COUNT II

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 *et seq*. Against All Defendants

71.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

72.     RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. §1962(c).

73.     RICO, among other provisions, makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. §1962(c). 18 U.S.C. §1962(d).

74.    At all relevant times, Defendants were "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

75.    Plaintiff is a "person" under 18 U.S.C. §1961(3), and has standing to sue as it was injured in its business and/or property as a result of Defendants' wrongful conduct alleged herein.

76.    Each Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

77.    A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. §1961(4).

78.    A RICO enterprise may be an association-in-fact with no formal legal structure but: (a) a common purpose; (b) a relationship among the associates of the enterprise; and (c) longevity to pursue the enterprise's purpose.

79.    Defendants and other entities that assisted them in deceptively and unlawfully marketing JUUL's e-cigarette to minors formed an association-in-fact ("RICO Enterprise").

80.    The RICO Enterprise is ongoing and continuing and created to achieve a common purpose to deceptively and unlawfully market JUUL's e-cigarette to minors by deceiving them about the dangers of vaping in order to exponentially grow JUUL's share of the e-cigarette market and increase their profits through unlawful means.

81.    The members of the RICO Enterprise are connected through contractual agreements, but the members of the RICO Enterprise have an existence separate from the RICO Enterprise.

82.    After abandoning its own unsuccessful efforts to compete with JUUL with its own line of fruit-flavored e-cigarette pods, and expressing a purported concern over fruity flavors contributing to the underage vaping epidemic, Altria acquired a 35% stake in JUUL with a $12.8 billion equity investment, thereby forming a RICO Enterprise intent on increasing JUUL's reach to minors through unlawful, deceptive, and unconscionable means.

83.    In furtherance of the RICO Enterprise, Defendants acted to hide their agenda by falsely denying that they were marketing directly to minors using the time-tested techniques that brought enormous success to Big Tobacco generations earlier.  Defendants also made false and

COMPLAINT                                                                                                    - 27 -

1   misleading statements about the nicotine content in JUUL e-cigarettes and downplayed or omitted

2   the risk of addiction from their use, all with the goal of addicting new underage customers who

3   were misled by Defendants to believe that JUUL's e-cigarette was not as harmful as traditional

4   cigarettes.   Other unnamed members of the RICO Enterprise, including, but not limited to,

5   marketing agencies and consultants and social media influencers, pushed these deceptive messages

6   to children through youth-oriented print campaigns, pop-up parties, social media campaigns, and

7   school marketing presentations disguised as "educational" presentations.

8       84.     To further the objective of the RICO Enterprise, its members knowingly conducted

9   or participated in, either directly or indirectly, the affairs of the RICO Enterprise through a pattern

10  of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c),

11  specifically by employing the use of the mail and wire facilities, in violation of 18 U.S.C. §1341

12  (mail fraud) and 18 U.S.C. §1343 (wire fraud).

13      85.     The multiple acts of racketeering activity conducted by the members of the RICO

14  Enterprise were made within ten years, were related to each other, and, thus, constitute a "pattern

15  of racketeering activity."

16      86.     The members of the RICO Enterprise used, directed the use of, and/or caused to be

17  used thousands of interstate mail and wire communications to carry out a material scheme and/or

18  artifice to defraud the public and further the RICO Enterprise's objectives through

19  misrepresentations and material omissions regarding their efforts to market directly to children, the

20  nicotine content of the JUUL e-cigarette, and the risk of addiction associated with its use.

21      87.     The acts of racketeering committed by the RICO Enterprise were committed

22  intentionally and knowingly in order to advance its objectives.

23      88.     Plaintiff has been injured and has sustained damage to its business and property as

24  a direct and proximate result of Defendants' RICO violations and racketeering activity.

25      89.     Plaintiff is therefore entitled to recover actual and treble damages, and its costs of

26  suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

27

28

COMPLAINT                                                                          - 28 -

**COUNT III**

**Violation of Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. §1962(d),
Against All Defendants**

90.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

91.    At all relevant times, Defendants were associated with the RICO Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), that is agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).

92.    Defendants engaged in a scheme to defraud residents and students of Plaintiff and the other Class members by marketing the JUUL e-cigarette through false and deceptive statements, *i.e.*, by directly marketing to minors and misrepresenting the safety of the product and hiding the addictive nature of the product.

93.    Defendants committed, or caused to be committed, a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including, but not limited to, the sale of nicotine products to minors and the related acts of mail fraud and wire fraud set forth above.

94.    As a result of Defendants' violations of 18 U.S.C. §1962(d), Plaintiff and the other Class members suffered direct damages.

**COUNT IV**

**Public Nuisance
Against All Defendants**

95.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

96.    Defendants, individually and acting through their employees and agents, have unreasonably interfered, and continue to interfere, with a right common to the general public of The City of Rochester, including by: (a) interfering significantly with The City of Rochester's public health, safety, peace, comfort, and convenience; (b) engaging in conduct proscribed by statute, ordinance, or administrative regulation; and (c) engaging in conduct of a continuing nature that has produced a permanent and long-lasting effect.

97. Each of the Defendants unreasonably interfered with the public health, safety, peace, and comfort of The City of Rochester and its residents and students by, among other things, actively promoting and marketing e-cigarettes to minors, disseminating false and misleading information concerning the safety of e-cigarettes, and downplaying or omitting the risk of addiction arising from their use in violation of the NHCPA.  In so doing, Defendants acted unreasonably and with actual malice.

98. As detailed herein, Defendants' conduct has interfered, and continues to interfere, with rights common to the general public of The City of Rochester and has caused Plaintiff to sustain damages special and particular, of a kind not sustained by the general public, including, but not limited to, increased educational expenditures, increased staffing expenditures, and increased law enforcement expenditures, among other things.

99. Plaintiff, acting on its own behalf and on behalf of its inhabitants, seeks monetary and injunctive relief to halt the threat of future harm and to abate the public nuisance Defendants created.

**COUNT V**

**Negligence**
**Against All Defendants**

100. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

101. Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains an injury or loss proximately caused by the defendant's breach.  Violation of a statute or regulation constitutes evidence of negligence.

102. Defendants owed Plaintiff, acting on its own behalf and on behalf of its inhabitants and students, statutory and common-law duties, including the duty to promote and market e-cigarettes truthfully, to disclose the risks of addiction associated with e-cigarette use, and to not market e-cigarettes to minors.  Each of the Defendants breached those duties by, among other things, promoting and marketing e-cigarettes directly to minors, misrepresenting the safety of e-cigarettes, and downplaying or omitting the risk of addiction from their use.  In so doing, Defendants acted with actual malice.

COMPLAINT                                                                 - 30 -

103.    Plaintiff and its inhabitants and students have suffered, and continue to suffer, both injuries and pecuniary losses directly and proximately caused by Defendants' breaches.  Among other things, Defendants have caused Plaintiff to suffer damages in the form of diversion of resources, increased educational expenditures, increased staffing expenditures, and increased law enforcement expenditures, among other things.  Defendants' breaches of the statutory and common-law duties they each owed to Plaintiff and its citizens and students are the proximate cause of the current vaping crisis and its resultant harm to Plaintiff and its residents and students.

**COUNT VI**

**Unjust Enrichment**
**Against All Defendants**

104.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

105.    Plaintiff conferred a benefit upon Defendants.  The City of Rochester's unprecedented underage nicotine addiction epidemic resulted in substantial costs in increased educational expenditures, increased staffing expenditures, and increased law enforcement expenditures, among other things.

106.    The unjust enrichment of Defendants is directly related to the damage, loss, and detriment to The City of Rochester caused by Defendants' false and unconscionable marketing to children. It would be inequitable under these circumstances for Defendants to retain this benefit without compensating Plaintiff for its value.

107.    Defendants appreciated those benefits or had knowledge of those benefits and accepted or retained those benefits under such circumstances as to make it inequitable for Defendants to retain those benefits without the payment of its value to Plaintiff.

108.    Defendants have thus been unjustly enriched by sales due to their deceptive marketing, which contributed to the current vaping epidemic.

109.    Plaintiff seeks recovery of the amounts by which Defendants were enriched as a result of their inequitable conduct.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    An Order certifying the Nationwide Class and New Hampshire Sub-Class as requested herein, appointing Plaintiff as Class Representative, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    An Order finding that the conduct alleged herein constitutes a public nuisance;

C.    An Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance, including through the establishment of an abatement fund to be used by Plaintiff to remedy the effects of the public nuisance;

D.    An Order awarding actual and compensatory damages, statutory damages in the maximum amount permitted by law, punitive damages, and pre-judgment and post-judgment interest;

E.    An Order awarding declaratory, injunctive, and other equitable relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices described herein, and directing Defendants to identify, with this Court's supervision, victims of its conduct and to pay them restitution of all monies acquired through any act or practice declared by this Court to be wrongful or unlawful;

F.    Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the other Class members;

G.    Awarding Plaintiff attorneys' fees and costs; and

H.    Providing any and all further legal and equitable relief as this Court may deem just and proper.

## VIII.    JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues herein.

DATED:  November 6, 2019                    ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                   SHAWN A. WILLIAMS


                                                           s/ Shawn A. Williams
                                                   SHAWN A. WILLIAMS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
JASON H. ALPERSTEIN
CHRISTOPHER C. GOLD
DOROTHY P. ANTULLIS
ERIC S. DWOSKIN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
jalperstein@rgrdlaw.com
cgold@rgrdlaw.com
dantullis@rgrdlaw.com
edwoskin@rgrdlw.com

*Attorneys for Plaintiff and the Proposed Class*

COMPLAINT

- 33 -